2020R01104/JLH/OJB

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. André M. Espinosa |
| | : | |
| v. | : | Mag. No. 21-11371 |
| | : | |
| USAMA MALIK and | : | **CRIMINAL COMPLAINT** |
| LAUREN S. WOOD | : | |

I, Victor Camaya, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

s/ Victor Camaya
_____
Victor Camaya, Special Agent
Federal Bureau of Investigation

Special Agent Victor Camaya attested to this Affidavit by telephone pursuant to F.R.C.P. 4.1(B)(2)(A) on this 1st day of December, 2021.

_____
Hon. André M. Espinosa
United States Magistrate Judge

## ATTACHMENT A

### Securities Fraud

From on or about April 2, 2020 to on or about April 6, 2020, in the District of New Jersey, and elsewhere, defendant

**USAMA MALIK and
LAUREN S. WOOD**

did unlawfully, willfully, and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and the mails and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit: by causing others to execute securities transactions in the securities of Biopharmaceutical Company-1 on the basis of material non-public information concerning Biopharmaceutical Company-1 in breach of a duty of trust and confidence that was owed directly, indirectly, and derivatively to the issuer of those securities, the shareholders of the issuers, and to other persons who were the source of the material non-public information.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240. 10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2.

## ATTACHMENT B

I, Victor Camaya, am a Special Agent of the Federal Bureau of Investigation. The information contained in the complaint is based upon my personal knowledge, as well as information obtained from other sources, including: (a) statements made or reported by various witnesses with knowledge of relevant facts; (b) my review of publicly available information; and (c) my review of evidence, including phone records, business records, financial and bank records, FINRA records, and other documents. Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where the contents of documents and the actions and statements of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

### Background Information

1. At all times relevant to this Criminal Complaint:

    a. Biopharmaceutical Company-1 ("Company-1") was a publicly-traded company listed on the NASDAQ Stock Exchange, with headquarters in Morris Plains, New Jersey. It developed, manufactured, and sold biotechnology products that were used, among other things, to detect and treat cancer. In or about October 2020, Biopharmaceutical Company-2 acquired Biopharmaceutical Company-1 for approximately $21 billion.

    b. From in or about 2018 to in or about October 2020, USAMA MALIK was the Chief Financial Officer (CFO) of Company-1.

    c. From in or about 2018 to in or about December 2019, LAUREN S. WOOD was the Head of Corporate Communications of Company-1 and reported to MALIK. During the insider trading scheme discussed below, WOOD and MALIK lived together at a residence in Washington, D.C.

    d. The NASDAQ Stock Exchange is a United States stock exchange with servers located in New Jersey.

### The Insider Trading Scheme

2. On or about December 5, 2019, MALIK wired approximately $65,000 to WOOD's personal checking account ("Checking Account"). On or about that same day—which was around the same time that WOOD left Company-1—WOOD

exercised her Company-1 stock options, and she used the approximately $65,000 that MALIK had wired her to help purchase approximately 4,687 Company-1 shares, at approximately $15.51 per share, valued at approximately $72,695 (the "Options Purchase").

3. On or about April 2, 2020, MALIK obtained material, non-public information about a Company-1 breast cancer drug that had proven effective in pre-market clinical trials (the "Non-Public Information"). After receiving that information, MALIK, using his cell phone, had a nine-second phone call with WOOD and communicated to WOOD the material Non-Public Information.

4. After WOOD received that Non-Public Information, she traded on it later that same day by purchasing approximately $64,000 in Company-1 stock, ultimately realizing over $213,000 in profits. MALIK also communicated the Non-Public Information to his relatives, who in turn traded on it.

5. As described below, during a subsequent investigation by the Financial Industry Regulatory Authority, MALIK also sought to coverup his relationship with WOOD.

### The Clinical Trial and the Non-Public Information

6. In or about November 2017, Company-1 began a clinical trial, which was a Phase 3 study (the "Study") to determine the efficacy and safety of a cancer drug (the "Cancer Drug"), an antibody-based drug designed to treat certain breast cancer patients who, to that point, had very limited treatment options beyond chemotherapy.[1] As part of the Study, an independent Data Safety Monitoring Committee ("DSMC"), composed of outside clinical research experts, was tasked with monitoring the Study's progress, which included reviewing safety and efficacy data.

7. In or about December 2019, Company-1 issued a press release announcing that the U.S. Food and Drug Administration (FDA) had accepted Company-1's application seeking accelerated approval of the Cancer Drug. As reported, the FDA set a target action date of on or about June 2, 2020, reflecting the

---

[1] When a new drug passes Phase 1 and 2 clinical studies (*i.e.*, small and medium studies, respectively, primarily focused on drug safety), the new drug can move to a Phase 3 study designed to determine its efficacy and safety. Phase 3 studies typically last one to four years and involve large pools of volunteers from the patient population for which the treatment is intended to be used. If a Phase 3 study is determined to be successful, the drug may be submitted to the Food and Drug Administration ("FDA") for final approval. According to the FDA, it is relatively rare for a drug to move past the Phase 3 stage: 70% of studies move past Phase 1; 33% of those move past Phase 2; and 25-30% of those studies move past Phase 3.

expected date on which the FDA would deliver its decision whether to approve the Cancer Drug.

8. As a result of that news, members of the Company-1 management team, including MALIK, were precluded from trading company stock during a "blackout period" (the "Blackout Period") between on or about March 12, 2020 and in or about June 2020. During this time, the DSMC continued its review of the Study data.

9. On or about March 27, 2020, sooner than initially expected, the DSMC informed Company-1's Chief Medical Officer (the "CMO") that in light of potential difficulties in obtaining new data during the COVID-19 pandemic, it wanted to seek permission from the FDA to perform its final analysis based on data that had been accumulated to date. Soon after, the FDA scheduled a conference call with the CMO and DSMC for on or about April 2, 2020, from 4:30-5:00 p.m. (the "Conference Call"). Leading up to the Conference Call, nobody at Company-1, including the CMO, was privy to the results of the DSMC's evaluation of the Study data.

10. During the Conference Call—which proceeded as planned on or about the afternoon of April 2, 2020—the CMO learned for the first time about the Non-Public Information, which, in substance and in part, consisted of the following: (1) the DSMC was recommending halting the Study based on compelling evidence of efficacy, meaning that the data had shown the Cancer Drug to be safe and effective; and (2) the FDA did not object to that decision, signaling a far greater likelihood that the FDA would fully approve the Cancer Drug.

### MALIK Learned the Non-Public Information and Passed It to Others

11. On or about April 2, 2020, in the immediate aftermath of the Conference Call, the CMO communicated the Non-Public Information to the Company-1's then-chairman and acting CEO (the "CEO"), who in turn passed the Non-Public Information to MALIK. The only three Company-1 employees who learned about the Non-Public Information on or about April 2, 2020 were the CMO, CEO, and MALIK.

12. An analysis of cell phone toll records provides the following timeline of how that Non-Public Information was disseminated:

a. <u>4:41-4:52 p.m.</u>: The CMO participated in the Conference Call and learned the Non-Public Information.

b. <u>4:39-4:59 p.m.</u>: MALIK, using his cell phone, called and spoke to the CEO. This conversation occurred simultaneously with the CMO's Conference Call with the DMSC.

c. <u>5:06-5:25 p.m.</u>: The CMO called the CEO. This 5:06 p.m. communication occurred approximately 14 minutes after the CMO concluded the Conference Call, and approximately seven minutes after MALIK spoke to the CEO. Given this close timeframe, and the magnitude of importance of the FDA's signal regarding the Cancer Drug's likely approval during the Conference Call, it is likely that the CMO and the CEO discussed the Non-Public Information during this 5:06 p.m. call.

d. <u>5:18 p.m.</u>: MALIK, using his cell phone, exchanged approximately six text messages with the CEO, who was simultaneously speaking on the phone with the CMO. In light of the real-time nature of this text exchange between MALIK and the CEO and the importance of the Non-Public Information, the CEO likely disclosed the Non-Public Information to MALIK.

13. Approximately 20 minutes later, at 5:38 p.m. that same evening, MALIK used his cell phone to call WOOD. The call connected, and it lasted approximately nine seconds (the "Nine-Second Call").

## WOOD Immediately Traded on the Non-Public Information

14. On or about April 2, 2020, at approximately 8:04 p.m. (approximately two-and-a-half hours after the Nine-Second Call), WOOD used a computer to log into WOOD's trading account (the "Trading Account") from IP address 73.128.106.34, which according to business records, was the IP address assigned to the residence shared by MALIK and WOOD.

15. At approximately 8:48 p.m., WOOD, using her Trading Account, placed a limit order[2] to purchase approximately 7,000 shares of Company-1 stock at approximately $10.25 per share (the "Trade"), which was the bid price when the markets had closed earlier that day. The next morning, on or about April 3, 2020, WOOD's Trade was completed at the price of approximately $9.20 per share.

---

[2] A limit order is an order to buy or sell a stock once it reaches a given price. Buy limit orders, for example, are only executed once the stock reaches the limit price (or a lower one). If the stock never reaches that price (*i.e.*, the price of the stock stays higher than the investor wants to pay), the order does not execute. Moreover, limit orders may be automatically canceled if the price entered is too far below the current market price.

16. Accordingly, WOOD purchased approximately 7,000 Company-1 shares for approximately $64,400. At the time of the Trade's order and completion, the DSMC's decision to halt the Study—and the FDA's positive reaction to that decision—remained non-public information.

17. WOOD placed and completed the Trade despite analysis released on or about April 2 and 3, 2020, by financial experts downgrading Company-1 stock. For example, on or about the morning of April 3, 2020, it was publicly reported that a Goldman Sachs analyst "double downgraded shares of [Company-1] from Buy to Sell and lowered the price target" to $5 per share, "suggesting roughly 53% downside."

### The Non-Public Information Becomes Public

18. On or about April 6, 2020, Company-1 issued a press release (the "Press Release") announcing that the Study would be halted due to compelling data of the Cancer Drug's efficacy. On or about that same morning, at approximately 9:34 a.m., WOOD texted MALIK.

19. Following the Press Release, Company-1's stock price, at market close, had increased to approximately $18.78 per share. Thus, after the Non-Public Information had become public, WOOD's Trade shares increased in value by approximately 104%, reflecting a total value of approximately $131,460, and profits of approximately $67,060. She more than doubled her investment on the Trade.

20. WOOD did not immediately sell her Trade shares. Nor did she sell the shares that she had previously acquired in or about December 2019 through her Options Purchase, discussed above.

21. On or about April 22, 2020, Company-1 publicly announced that the FDA granted accelerated approval of the Cancer Drug, which caused Company-1 stock price to increase once again.

22. On or about May 4, 2020, WOOD sold all of her Options Purchase shares, now worth approximately $144,122.06. On or about May 8, 2020, WOOD transferred approximately $144,018.33 of those funds into her Checking Account. She also wrote a check to MALIK, dated on or about May 8, 2020, from her Checking Account for approximately $65,000. WOOD wrote in the check's memo line, "Home."

23. The $65,000 sum mirrored the amount of money that MALIK had given WOOD on or about December 5, 2019, which WOOD used to acquire the Options Purchase.

24. On or about July 6, 2020, at approximately 10:22 a.m., WOOD sold all of her Trade shares for a total of approximately $278,018, at the price of approximately $39.7169 per share. As a result, WOOD realized gross profits on the Trade of approximately $213,618 from her initial $64,400 investment.

### MALIK Also Passed the Non-Public Information to Family Members, Who Trade On It

25. MALIK also provided the Non-Public Information to his relatives, who in turn traded in Company-1 stocks.

26. For example, on or about April 3, 2020, MALIK's brother-in-law, using an online trading account, bought 1,000 shares, at $8.98 per share, and another 1,000 shares at $9.43 per share. On or about April 6, 2020, after Company-1 issued the Press Release, MALIK'S brother-in-law sold all of those shares for a profit.

### The FINRA Investigation

27. On or about July 10, 2020, as part of its investigation, FINRA sent Company-1 an information request letter (the "FINRA Letter") and instructed that it be circulated to all Company-1 officers and directors, which included MALIK. The FINRA Letter asked MALIK (and the others who received it) to "provide a detailed description of any past or present relationship" he had with people or entities named on an enclosed list. (Emphasis in original.)

28. Subsequently, on or about July 15 and 19, 2020, MALIK used his cell phone to place a total of approximately four phone calls to WOOD.

29. By correspondence dated on or about August 20, 2020, Company-1 sent FINRA its responses to the FINRA Letter, which included MALIK's disclosures about his relevant relationships. Those disclosures did not mention WOOD. On or about the same day, MALIK placed approximately two calls to WOOD. According to phone records, one of those calls lasted approximately 4 minutes and 45 seconds.

30. On or about August 21, 2020, FINRA sent Company-1 a follow-up request for information specifically pertaining to WOOD. In the Company-1 Response, MALIK again concealed the extent of his relationship with WOOD, describing her only as a "former colleague," and failing to mention their romantic or otherwise personal relationship, common home address, and frequent communications.

31. Nor did MALIK disclose his Nine-Second Call with WOOD, on or about April 2, 2020, minutes after he likely learned about the Non-Public

Information. Instead, MALIK falsely stated, "I have had no correspondence with [WOOD] between March 27, 2020 and April 3, 2020."